IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| B.I.V.R.[1] | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MARTIN O'MALLEY, | : | NO.  22-5143 |
| Commissioner of Social Security[2] | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                    August   27, 2024

Plaintiff seeks review of the Commissioner's decision denying her application for

disability insurance benefits ("DIB").  For the reasons that follow, I conclude that the

decision of the Administrative Law Judge ("ALJ") is not supported by substantial

evidence.  Because the record is complete and supports a finding of disability and further

development/consideration of the record would serve no purpose, I will remand the case

for an award of benefits.

**I.     PROCEDURAL HISTORY**

Plaintiff protectively filed an application for DIB on December 15, 2015, alleging

disability beginning on February 1, 2015, as a result of depression, anxiety, insomnia, and

---

[1]Consistent with the practice of this court to protect the privacy interests of plaintiffs in social security cases, I will refer to Plaintiff using her initials.  See Standing Order – In re:  Party Identification in Social Security Cases (E.D. Pa. June 10, 2024).

[2]Martin O'Malley became the Commissioner of Social Security on December 20, 2023.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Commissioner O'Malley should be substituted for Kilolo Kijakazi as the defendant in this action.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act.  42 U.S.C. § 405(g).

shoulder problems.  Tr. at 88, 158, 176.[3]  Her application was denied initially and she

requested an administrative hearing.  Id. at 89-93, 97-98.  After holding a hearing on

December 7, 2017, id. at 37-74, the ALJ issued an unfavorable decision on June 4, 2018,

Id. at 23-32.  The Appeals Council denied Plaintiff's request for review on December 21,

2018, id. at 1-3, making the ALJ's June 4, 2018 decision the final decision of the

Commissioner.  20 C.F.R. § 404.981.

Plaintiff appealed the Commissioner's decision to the federal court and I granted

the Commissioner's uncontested motion for remand on October 28, 2019.  Tr. at 721-23.

On remand, the Appeals Council referred the case to a different ALJ who held a hearing

on June 3, 2020, id. at 724-25, 1835-59.[4]  On July 21, 2020, the ALJ denied Plaintiff

benefits, id. at 767-77, and Plaintiff filed exceptions with the Appeals Council.  Id. at

903-09.  The Appeals Council assumed jurisdiction of the case and remanded the case to

the ALJ.[5]  Id. at 788-90.

_____

[3]To be entitled to DIB, Plaintiff must establish that she became disabled on or
before her date last insured ("DLI").  20 C.F.R. § 404.131(b).  The ALJ found and the
Certified Earnings Record confirms that Plaintiff was insured through December 31,
2018.  Tr. at 654, 1035.
    Plaintiff had previously filed for DIB in May 2014, and was denied benefits
initially and upon reconsideration.  Tr. at 76.  Her current alleged onset date, February 1,
2015, is the month following the final denial of her prior application.  Id.

[4]The transcript of this hearing was not included in the record originally filed by
Defendant.  Doc. 5.  Defendant later provided the transcript upon request, and its
pagination continues from the original record.  Doc. 11-2.

[5]When a case is remanded by the District Court, the subsequent decision of the
ALJ will become the final decision of the Commissioner unless the Appeals Council
assumes jurisdiction of the case, either on its own authority or based on exceptions filed
by the claimant.  20 C.F.R. § 404.984.

On June 8, 2022, the ALJ held another administrative hearing, tr. at 675-94, after which the ALJ again denied Plaintiff's claim for benefits on August 30, 2022. Id. at 650-67. Plaintiff did not seek further Appeals Council review, nor did the Appeals Council assume jurisdiction, making the ALJ's August 30, 2022 decision the final decision of the Commissioner for purposes of this action. 20 C.F.R. § 404.984(d). Plaintiff initiated the current action on December 26, 2022. Doc. 1. The matter is now fully briefed and ripe for review. Docs. 6, 9-10.[6]

## II.   LEGAL STANDARD

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusions that Plaintiff is not disabled. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." Zirnsak v. Colvin, 777 F.2d 607, 610 (3d Cir. 2014) (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). The court has plenary review of legal issues. Schaudeck, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

---

[6]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). See Standing Order – In Re: Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 4.

impairment . . . which has lasted or can be expected to last for . . . not less than twelve months." 42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

> 1.      Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.      If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities;
>
> 3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and
>
> 5.      If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. § 404.1520(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007); see also Biestek v. Berryhill, 587 U.S. 97, 102 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion'") (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).  The court has plenary review of legal issues.  <u>Schaudeck</u>, 181 F.3d at 431.

## III.   <u>DISCUSSION</u>

### A.   <u>ALJ's Findings and Plaintiff's Claims</u>

In the August 30, 2022 decision under review, the ALJ found at step one that Plaintiff has not engaged in substantial gainful activity from her alleged onset date of February 1, 2015, through her date last insured of December 31, 2018.  <u>Tr.</u> at 654.  At step two, the ALJ found that Plaintiff suffers from the severe impairments of major depressive disorder ("MDD"), generalized anxiety disorder ("GAD"), post-traumatic stress disorder ("PTSD"), bursitis of the right shoulder, cervical radiculopathy, and dorsalgia (back pain).  <u>Id.</u>  At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Listings.  <u>Id.</u> at 655.

The ALJ determined that Plaintiff retains the RFC to perform light work except she can occasionally reach overhead or push/pull with the dominant (right) upper extremity, but has frequent use in all other planes and no limitations with the non-dominant (left) upper extremity; frequently climb ramps and stairs, balance, stoop, kneel, and crouch; never crawl or climb ladders, ropes, or scaffolds; and must avoid concentrated exposure to hazards.  <u>Tr.</u> at 656.  Plaintiff can understand, remember, and carry out simple instructions and use judgment to make simple work-related decisions; can occasionally interact with co-workers, supervisors, and the public; cannot perform work requiring a specific production rate such as assembly line work or work that

requires hourly quotas, and she can deal with occasional changes in a routine work setting.  Id.  Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff is unable to perform her past relevant work, but can perform other jobs that exist in significant numbers in the national economy, including office helper, cafeteria attendant, and housekeeper.  Id. at 664, 666.  As a result, the ALJ concluded that Plaintiff is not disabled.  Id. at 666.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to properly consider the medical opinion evidence and to accept, reject, or explain her consideration of functional limitations described by the medical sources to which she ascribed weight.  Doc. 6 at 4-14; Doc. 10 at 1-4.  As a result of the ALJ's repeated failure to properly consider the evidence and due to the excessive delay in the case, Plaintiff argues that an award of benefits is warranted.  Doc. 6 at 14-17. Defendant responds that substantial evidence supports the ALJ's evaluation of the opinion evidence and the RFC assessment, and that an award of benefits is not an appropriate remedy in any event.  Doc. 9 at 5-17.

**B.**     **Plaintiff's Claimed Limitations and Testimony at the Hearing**

Plaintiff was born on April 25, 1969, and thus was 45 years old when her alleged disability began (February 1, 2015), and 49 years old on her date last insured for DIB (December 31, 2018).  Tr. at 41, 158.  She is five feet, four inches tall and weighs approximately 152 pounds.  Id. at 41, 176.  Plaintiff completed high school and law

school in the Dominican Republic.  Id. at 42-43, 177.[7]  She speaks and writes in Spanish and required an interpreter at the administrative hearings.  Id. at 39, 43, 678-79, 1837. Her only job within the fifteen years prior to her alleged onset date was as an office worker/customer service representative at a money transfer business.  Id. at 44-45, 177. She stopped working in 2006 after being assaulted and beaten at work.  Id. at 46; see also id. at 330, 375 (Plaintiff described being pistol whipped during a robbery in 2006); 405 (Plaintiff was struck with a gun in 2006 to the right side of her neck and shoulder).[8]

Plaintiff lives with her husband, her husband's son, and a grandson.  Tr. at 684. At the first administrative hearing, which took place before the expiration of Plaintiff's insured status, Plaintiff testified that she has pain in her back and arm caused by a "[h]ernia on the discs."  Id. at 46.  Plaintiff's right arm is weak, she has carpal tunnel syndrome, and she drops things.  Id. at 48, 50.  Plaintiff said that being in one position too long makes the pain worse and estimated that she can walk for 10-15 minutes, stand for 15-20 minutes at one time, sit for 10-15 minutes, and can lift 8-10 pounds.  Id. at 49-51.  At the second hearing, Plaintiff complained of back, neck, shoulder and hand pain

---

[7]Plaintiff's disability report indicates that she completed high school and three years of college.  Tr. at 177.  At the first hearing, Plaintiff explained that she finished high school and law school in the Dominican Republic, and that she practiced law in the Dominican Republic more than 15 years prior to the hearing.  Id. at 43.

[8]There is a discrepancy in Plaintiff's testimony regarding when she stopped working.  At the initial hearing, Plaintiff testified that she stopped working in 2006, but stated, "[t]hen I returned, thinking I was able to do it, but I couldn't do it because of the public."  Tr. at 46; see also id. at 1379 (indicating she has not worked since she was assaulted in 2006).  In her Function Report, Plaintiff indicated that she worked until April of 2013, id. at 177, and testified at the most recent hearing that she stopped working in April of 2013.  Id. at 1846.  In either event, Plaintiff stopped working prior to her alleged onset date, so the discrepancy is immaterial.

7

and explained that she had to put the telephonic hearing on the speaker because she could no longer hold her phone. Id. at 1847-48. At that time, Plaintiff testified that she can stand and walk comfortably for 10-15 minutes each, and sit for 15-20 minutes. Id. at 1848-49. At the most recent administrative hearing on June 8, 2022, Plaintiff complained of pain in her left arm and back. Id. at 685. She has been attending physical therapy for a few years and testified that it helps when she is receiving it, but the pain returns quickly. Id. She has pain in both shoulders, left worse than right. Id. at 686.

Plaintiff also suffers from anxiety and depression and described crying spells and difficulty sleeping. Tr. at 52, 55. Plaintiff testified that her memory is "[n]ot very good" and that she gets frustrated and upset when she forgets things. Id. at 52. She is uncomfortable in crowds and around strangers. Id. at 53. She isolates herself and spends time by herself in her room crying. Id. at 59. At the second hearing, Plaintiff explained that she has problems interacting with people because she gets panicked and afraid that she will be attacked again. Id. at 1847.[9]

Plaintiff testified that she sometimes cooks potatoes and makes sandwiches. Tr. at 55. She does not do laundry or housework and goes shopping once a month with someone accompanying her. Id. at 56. Although Plaintiff has a driver's license, she drives very infrequently and her husband or another relative drives her to doctors' appointments. Id. at 42, 56.

---

[9]In her Function Report, Plaintiff stated that after suffering a burglary she has been afraid to go outside. Tr. at 189. In context, it appears that this is a reference to the 2006 assault when she was working at the money transfer business. She also complained of problems with her memory, concentration, and getting along with others. Id. at 188.

VEs testified at each of Plaintiff's hearings.  According to the VE who testified at the first hearing, Plaintiff's prior job working in the money transfer office is a combination of four other jobs, normally performed at the light level:  money order clerk, skilled; administrative clerk, semiskilled; cleaner/housekeeper, unskilled; and sales clerk, semiskilled.  Tr. at 62-63.  Although each of these jobs is categorized as light work, the VE noted that Plaintiff's work was medium work as she performed it – lifting 40 pound file boxes.  Id. at 63.

Based on the hypothetical posed by the ALJ at the most recent administrative hearing with the limitations included in the ALJ's RFC assessment, see supra at 5-6, the VE testified that such an individual would not be able to perform Plaintiff's past relevant work, but could perform other work, including office helper, cafeteria attendant, and cleaner/housekeeper.  Tr. at 688-89.  Responding to questions from Plaintiff's counsel, the VE testified that an individual markedly limited in the ability to respond to usual work situations and changes in a routine work setting, resulting in the person decompensating or being off task 25% of the time, would not be employable.  Id. at 691-92.  Similarly, if the person required an unreasonable amount and length of breaks amounting to an additional 15% of time off-task (beyond the accepted lunch and break times), competitive employment would be eliminated.  Id. at 692.

### C. __Medical Evidence Summary__

I will review evidence relating to Plaintiff's physical impairments before turning to evidence of her mental impairments.  As previously noted, in 2006 Plaintiff was struck with a gun on the right side of her neck and shoulder while at work.  Tr. at 330, 402.

Plaintiff sought medical treatment for the resultant neck, back, and shoulder pain prior to her alleged onset date and was diagnosed with cervical strain, possible right shoulder arthritis and/or impingement, and mild arthritis of the knees.  Id. at 264[10] (4/3/14 – noting limited range of motion of the right shoulder), 330-31 (8/25/14 – diagnoses),[11] 337 (8/20/14 – complaints of back pain, joint pain, and weakness), 364-65 (9/18/14 – back pain, prescribed Naproxen and Flexeril[12]).  An MRI of the cervical spine done on May 12, 2007, was normal.  Id. at 315.

In 2016, after her alleged onset date, Plaintiff sought routine medical treatment from Greater Philadelphia Health Action ("GPHA").  Tr. at 466-508 (3/4/16 – 12/6/16). On April 20, 2016, Plaintiff complained of right shoulder pain beginning a week earlier. Id. at 493.  Ramon Gadea, M.D., noted muscle spasm in Plaintiff's cervical spine, a positive Phalen's test on the right, and an abnormal Allen test on the right.[13]  Id. at 496.

---

[10]Some of Plaintiff's medical records are in Spanish, and I have attempted to translate anatomical and medical terms into English for purposes of this records review.

[11]The report authored by Alan Friedman, M.D., which is included on pages 330 and 331 of the record, appears to be a consultative examination, perhaps conducted in conjunction with Plaintiff's earlier application for benefits.

[12]Naproxen is a nonsteroidal anti-inflammatory drug.  See https://www.drugs.com/naproxen.html (last visited Aug. 14, 2024).  Flexeril (generic cyclobenzaprine) is a muscle relaxant.  See https://www.drugs.com/flexeril.html (last visited Aug. 14, 2024).

[13]The Phalen test is used in diagnosing carpal tunnel syndrome.  Dorland's Illustrated Medical Dictionary, 32nd ed. (2012), at 1896.  The Allen test is used to detect the occlusion of ulnar or radial arteries.  Id. at 1885.

Dr. Gadea refilled Plaintiff's prescription for Tramadol,[14] id. at 497, and referred Plaintiff

for physical therapy and for consultation with an orthopedic surgeon.  Id. at 495.

      On May 11, 2016, Plaintiff saw Mark Desmond, M.D., at Aria 3B Orthopaedic

Specialists.  Tr. at 1370-71.  Dr. Desmond noted that Plaintiff had limited motion of the

neck due to pain, and "5/5 thumb extension and finger flexion, finger extension, and grip

strength," and ordered x-rays, EMG testing, and therapy.  Id. at 1370.  On June 1, 2016,

Barry Schnall, M.D., completed electrodiagnostic studies of Plaintiff's neck and right

arm pain.  Id. at 1368-69.  The doctor noted weakness of 4/5 in Plaintiff's right triceps

and wrist.  Id. at 1368.  The testing revealed chronic right C6 and/or C7 radiculopathy,

and Dr. Schnall recommended a Medrol Dosepak, a trial of Neurontin, or epidural

injections.[15]  Id. at 1369.

      Plaintiff began physical therapy with Novacare Rehabilitation on May 11, 2016, at

which time she had been diagnosed with radiculopathy in the cervical region.  Tr. at 402.

Physical therapist Jessica McShane noted that Plaintiff had decreased right shoulder and

elbow range of motion, and decreased grip strength in her right hand.  Id. at 403.

      Plaintiff again saw Dr. Desmond on June 30, 2016, continuing to complain of neck

and right arm pain.  Tr. at 1367.  When Dr. Desmond gave Plaintiff the choice of taking

---

[14]Tramadol is an opioid agonist used to treat moderate to moderately severe chronic pain.  See https://www.drugs.com/tramadol.html (last visited Aug. 14, 2024).

[15]Medrol Dosepak is a steroid that prevents the release of substances in the body that cause inflammation.  See https://www.drugs.com/mtm/medrol-dosepak.html (last visited Aug. 14, 2024).  Neurontin is used to treat neuropathic pain.  See https://www.drugs.com/neurontin.html (last visited Aug. 14, 2024).

Neurontin or interventional pain management, Plaintiff chose Neurontin and began a trial period.  Id.

On July 7, 2016, after 12 physical therapy sessions, therapist McShane noted that Plaintiff had improved right arm range of motion and cervical rotation.  Tr. at 442. However, Ms. McShane indicated that Plaintiff continued to have "moderate deficits in right hand grip strength."  Id.  Plaintiff completed physical therapy on August 2, 2016, when she was planning to return to the Dominican Republic.  Id. at 463.  At that time, Ms. McShane indicated that Plaintiff continued to have difficulty gripping with her right hand and had a sitting tolerance of 10-20 minutes and a standing tolerance of 20 minutes. Id. at 461.  When Plaintiff followed up with Dr. Gadea at GPHA on November 29, 2016, Plaintiff did not complain of neck pain or problems with her right hand.  Id. at 477.[16]

On August 8, 2018, Plaintiff again complained to Dr. Gadea about neck pain, described as worsening and burning pain.  Tr. at 1334.  The doctor noted tenderness throughout the spine on examination and an antalgic gait.  Id. at 1337.  Dr. Gadea prescribed cyclobenzaprine and nabumetone,[17] ordered x-rays of Plaintiff's cervical and lumbar spine, and referred Plaintiff for physical therapy and an orthopedic surgical consultation.  Id. at 1336-37.  On November 9, 2018, after 14 therapy sessions, physical

---

[16]At the first hearing, counsel explained that there were no treatment records for 2017 because Plaintiff had gone to live with family in the Dominican Republic where she felt safer, and they had been unable to obtain records from treatment providers there.  Tr. at 53-54.

[17]Nabumetone is a nonsteroidal anti-inflammatory drug.  See https://www.drugs.com/mtm/nabumetone.html (last visited Aug. 14, 2024).

therapist McShane indicated that Plaintiff was responding well to aerobic and flexibility programs and had increased her ambulation tolerance to 20 minutes.  Id. at 1184-86.  On December 11, 2018, Dr. Gadea noted that Plaintiff was participating in physical therapy and saw an orthopedist at Temple two months earlier.  Id. at 1331.[18]  He renewed Plaintiff's cyclobenzaprine and nabumetone.  Id. at 1332.[19]

Plaintiff returned to GPHA on January 31, 2020,[20] with complaints of ongoing back pain.  Tr. at 1321.  Nurse practitioner Christopher Aguilar renewed Plaintiff's prescriptions for cyclobenzaprine and nabumetone, added diclofenac topical gel, and referred Plaintiff for occupational therapy.[21]  Id. at 1321-22.

Physical therapy notes resume on February 12, 2020, at which time treatment was focused on increasing lumbar flexion/extension and improving hip strength.  Tr. at 1155-56.  During therapy a week later, Plaintiff complained of right shoulder and neck pain in addition to the lower back pain.  Id. at 1152.  On March 5, 2020, Ms. McShane noted that

---

[18]Treatment notes from December 26, 2018, identify the orthopedist as Dr. Noreski.  Id. at 1327.  There are no treatment notes from Temple or Dr. Noreski in the record.

[19]Although Plaintiff's insured status for purposes of DIB expired on December 31, 2018, tr. at 1035, I will consider the treatment notes that post-date 2018 regarding Plaintiff's conditions that were diagnosed prior to the expiration of her insured status.

[20]The treatment note from January 11, 2020, indicates that Plaintiff lost her health insurance and could not afford to see a primary care physician in 2019.  Tr. at 1321.

[21]Diclofenac is a nonsteroidal anti-inflammatory drug.  See https://www.drugs.com/diclofenac.html (last visited Aug. 14, 2024).

Plaintiff was able to walk for nearly a mile without increased back and hip pain.  Id. at

1139.  The following week, Plaintiff was able to walk for 1.5 miles.  Id. at 1133.

Russell Amundson, M.D., conducted a consultative Internal Medicine

Examination on January 27, 2016.  Tr. at 375-378.  Plaintiff had a normal gait and

musculoskeletal examination, 5/5 strength in her upper and lower extremities, and

stable/nontender joints.  Id.  The doctor noted limitation in range of motion of Plaintiff's

right shoulder, right knee, and right hip.  Id. at 385-86.  Dr. Amundson opined that

Plaintiff could sit for a total of 4 hours in an 8-hour day in 2-hour increments, and stand

and walk for a total of 2 hours each in an 8-hour workday in 30-minute increments.  Id. at

380.  He also found Plaintiff could continuously lift and carry up to 10 pounds, frequently

lift and carry 11-20 pounds, and occasionally lift and carry 21-50 pounds.  Id. at 379.

On February 19, 2016, at the initial consideration level, Minda Bermudez, M.D.,

found from her review of the record that Plaintiff could occasionally lift/carry 20 pounds,

frequently lift/carry 10 pounds, stand and/or walk for 6 hours in an 8-hour day, sit for 6

hours in an 8-hour day, and was limited in her ability to reach overhead with her right

arm.  Tr. at 81.

With respect to Plaintiff's mental impairments, the record contains evidence

predating her alleged onset date.  Tr. at 567 (6/19/06 – psychiatric evaluation indicating

prescriptions for Zoloft, Klonopin, and Restoril[22]), 600 (8/15/06 – PTSD treatment

---

[22]Zoloft is an antidepressant.  See https://www.drugs.com/zoloft.html (last visited
Aug. 14, 2024).  Klonopin is a benzodiazepine used to treat panic disorder.  See
https://www.drugs.com/klonopin.html (last visited Aug. 14, 2024).  Restoril is a

includes psychotherapy, Zoloft, Prosom, and Klonopin[23]), 535-64 (2/8/11 – 11/15/12 –

treatment for MDD including therapy and Zoloft, Risperdal, Tranxene, and Klonopin[24]).

On August 30, 2014, at what appears to be a consultative examination possibly

conducted in conjunction with her earlier application for benefits, Plaintiff reported that

she has been taking psychotropic medications since the 2006 assault, and was, at the time

of the evaluation, taking Zoloft and Xanax.[25]  Tr. at 348.  Alec Roy, M.D., found Plaintiff

had a rule-out diagnosis of chronic PTSD with superimposed anxious and depressed

mood, noted avoidant behavior and startling easily, flashbacks, and nightmares, and

assigned a Global Assessment of Functioning ("GAF") score of 43.[26]  Id. at 350.  Plaintiff

---

benzodiazepine used to treat insomnia.  See https://www.drugs.com/restoril.html (last
visited Aug. 14, 2024).

[23] Prosom is a benzodiazepine used to treat insomnia.  See
https://www.drugs.com/cons/prosom.html (last visited Aug. 14, 2024).

[24] Risperdal is an antipsychotic used to treat schizophrenia and symptoms of
bipolar disorder.  See https://www.drugs.com/risperdal.html (last visited Aug. 14, 2024).
Tranxene is a benzodiazepine used to treat anxiety disorders.  See
https://www.drugs.com/mtm/tranxene-t-tab.html (last visited Aug. 14, 2024).

[25] Xanax is a benzodiazepine is used to treat anxiety disorders and anxiety caused
by depression.  See https://www.drugs.com/xanax.html (last visited Aug. 14, 2024).

[26] The GAF score is a measurement of a person's overall psychological, social, and
occupational functioning, and is used to assess mental health.  Diagnostic and Statistical
Manual of Mental Disorders, 4th ed. Text Revision (2000) ("DSM IV-TR"), at 32.  A
GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) [or] any serious impairment in social,
occupational, or school functioning (e.g., no friends, unable to keep a job)."  Id. at 34.
The DSM-IV-TR was replaced in 2013 with the Diagnostic and Statistical Manual of
Mental Disorders, 5th ed. (2013) ("DSM 5").  The DSM 5 eliminated reference to the
GAF score.  However, the Commissioner continues to receive and consider GAF scores
in medical evidence, see Administrative Message-13066 (July 22, 2013), and an ALJ

began treatment at St. Joseph's Behavioral Health on October 3, 2014, for complaints of persistent fearfulness, anxiety, trust-issues, irritability, and decreased appetite.  Id. at 352.

There are some mental health treatment records from the relevant period (February 1, 2015 through December 31, 2018), including Plaintiff's outpatient mental health treatment at Nueva Vida Behavioral Health.  Tr. at 369-74, 509-34.  On November 27, 2015, therapist Geraldo Castro noted that Plaintiff was cooperative and her mood and affect were neutral.  Id. at 372.  Therapist Castro noted that Plaintiff was working on decreasing her depression and anxiety in December 2015.  Id. at 371.  On March 3, 2016, psychiatrist G. Pirooz Sholevar, M.D., continued Plaintiff on Prozac, hydroxyzine, and melatonin.[27]  Id. at 518.  In a biopsychosocial evaluation completed on June 3, 2016, a psychiatrist at Nueva Vida noted auditory hallucinations, blunted affect, and depressed/anxious mood, and indicated that Plaintiff was slow.  Id. at 510, 513.  The doctor diagnosed Plaintiff with major depression, chronic, and rule out diagnoses of GAD, PTSD, and mood disorder secondary to her medical conditions.  Id. at 515.[28]  The doctor noted problems of depression, anxiety, poor sleep, explosive/coerce disorder, and

_____

must consider a GAF score with all of the relevant evidence in the case file.  Nixon v. Colvin, 190 F. Supp.3d 444, 447 (E.D. Pa. 2016).

[27]Prozac is an antidepressant.  See https://www.drugs.com/prozac.html (last visited Aug. 14, 2024).  Hydroxyzine (brand name Vistaril or Atarax) is an antihistamine that is used as a sedative to treat anxiety and tension.  See https://www.drugs.com/hydroxyzine.html (last visited Aug. 14, 2024).  Melatonin is a natural hormone that helps to maintain the wake-sleep cycle and is made synthetically and available without a prescription.  See https://www.drugs.com/melatonin.html (last visited Aug. 14, 2024).

[28]The signature on the evaluation is illegible.  Tr. at 517.

dysphoria.  Id.  During her treatment at Nueva Vida, Plaintiff was prescribed Prozac, hydroxyzine, melatonin and Vistaril.  Id. at 509.  Therapist Castro continued to note Plaintiff's anxious and depressed mood in subsequent therapy sessions.  Id. at 523 (6/23/16), 522 (7/8/16), 521 (7/28/16), 520 (8/4/16), 519 (11/30/16).

In 2018, Plaintiff was treated at Citywide Community Counseling Services for MDD, GAD, panic attacks, and PTSD.  Tr. at 1375-83.  On July 19, 2018, psychiatrist Zaw Myint, M.D., noted Plaintiff's nightmares, flashbacks, auditory hallucinations, and the feeling that someone was following her.[29]  Id. at 1379.  In addition, the doctor noted that Plaintiff has been spending "a lot of time by herself," has suicidal thoughts three times a month "and took a lot of pills one time" when her father passed away in October 2016.  Id.  He prescribed Lexapro, Atarax, and prazosin.[30]  Id. at 1380.

When Plaintiff returned on September 11, 2018, having missed her August appointment, she reported that the medicine reduced her nightmares and flashbacks, but she ran out of medication.  Id. at 1377.  The doctor stressed the need for compliance with

---

[29]Dr. Myint's notes indicate that Plaintiff was previously treated by Dr. Ballas at Citywide and was last seen on January 30, 2018, and she was treated with Prozac, melatonin, and Vistaril.  Tr. at 1379.  The record does not contain Dr. Ballas's notes and the only treatment notes provided by Citywide begin with Dr. Myint's notes of July 19, 2018.  Id.

[30]Lexapro is an antidepressant.  See https://www.drugs.com/lexapro.html (last visited Aug. 14, 2024).  Prazosin is used to treat hypertension.  See https://www.drugs.com/mtm/prazosin.html (last visited Aug. 14, 2024).  It is also used to treat nightmares related to PTSD by relaxing muscles and reducing blood pressure.  See https://www.medicalnewstoday.com/articles/best-medication-for-ptsd-nightmares#:~:text=One%20possible%20medical%20treatment%20for,occur%20following%20a%20traumatic%20event. (last visited Aug. 14, 2024).

medications and appointments.  Id.  Plaintiff missed her next appointment and was

without medications for two weeks when she was next seen on October 30, 2018.  Id. at

1376.  The doctor noted that Plaintiff's nightmares were getting better on prazosin.  Id.

Again the doctor stressed compliance with medications and appointments.  Id.  On

December 4, 2018, Dr. Myint indicated that Plaintiff again missed an appointment and

noted that "the current medications are working well for her," but she is "not good when

she ran out of medicine."  Id. at 1375.  He noted that Plaintiff also complained of hearing

voices.  Id.

Plaintiff continued sporadic mental health treatment after her insured status

expired.  See, e.g., tr. at 1372-73 (1/28/20 – Citywide treatment for MDD, panic disorder,

and PTSD with prescriptions for Celexa and Prazosin[31]), 1679-1759 (1/5/22-6/6/22 –

Comhar records with symptoms including auditory hallucinations and diagnoses of MDD

and GAD with prescriptions for Seroquel and Neurontin[32]).

On January 27, 2016, Erin Volpe, Ph.D., conducted a consultative Psychiatric

Evaluation.  Tr. at 391-95.  Dr. Volpe noted that Plaintiff endorsed passive thoughts of

suicide but had no suicidal intent or active ideation.  Id. at 392.  The doctor found

Plaintiff's mood was dysthymic and her affect depressed and indicated that Plaintiff

exerted "no effort to her personal hygiene and grooming."  Id. at 392-93.  Dr. Volpe

---

[31]Celexa is an antidepressant used to treat MDD.  See
https://www.drugs.com/celexa.html (last visited Aug. 14, 2024).

[32]Seroquel is used to treat schizophrenia and with other medications to prevent
episodes of depression in patients with bipolar disorder.  See
https://www.drugs.com/seroquel.html (last visited Aug. 14, 2024).

found that Plaintiff's attention and concentration were impaired due to limited intellectual functioning, depression, and anxiety, noting that Plaintiff erred in the serial 3s and was unable to complete the sequence.  Id. at 393.  Similarly, the doctor found Plaintiff's memory was impaired, remembering only 1 of 3 objects after 5 minutes and an inability to reverse 4 digits.  Id.  Dr. Volpe diagnosed Plaintiff with PTSD and an unspecified depressive disorder.  Id. at 394.  The doctor also noted that Plaintiff's psychiatric problems "may significantly interfere with [her] ability to function on a daily basis," and Plaintiff would need help managing her funds in light of her "stated and observed limited memory and concentration abilities."  Id.

In a Medical Source Statement, Dr. Volpe found that Plaintiff had mild limitation in the ability to understand and remember simple instructions; moderate limitation in the abilities to carry out simple instructions and make judgments on simple work-related decisions; and marked limitation in the abilities to understand, remember, and carry out complex instructions and make judgments on work-related decisions.[33]  Tr. at 396.  In social functioning, the doctor found Plaintiff had moderate limitation in the abilities to interact with the public, co-workers, and supervisors; and a marked limitation in the ability to respond appropriately to usual work situations and to changes in a routine work setting.  Tr. at 397.

---

[33]The form asked the doctor to rate Plaintiff's abilities using a 5-point scale: "None," "Mild" defined as a slight limitation, "Moderate" defined as more than a slight limitation but able to function satisfactorily, "Marked" defined as a serious limitation or a substantial loss in the ability to effectively function, and "Extreme" defined as a major limitation with no useful ability to function.  Tr. at 396.

On February 2, 2016, at the initial consideration stage, Erin Urbanowicz, Psy D., found from a review of the records that Plaintiff suffered from affective disorders and anxiety-related disorders that resulted in mild restriction of activities of daily living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace.  Id. at 79.

**D.     Plaintiff's Claims**

Plaintiff presents two substantive claims.  One challenges the ALJ's consideration of the mental health treatment evidence, specifically the weight given to the differing opinions from the mental health physicians.  The second challenges the ALJ's failure to include mental health and physical limitations noted by the physicians whose opinions the ALJ gave weight.  Plaintiff also argues that the case should be remanded for an award of benefits.  Because I find that the ALJ erred in considering both the mental health treatment evidence and Dr. Amundson's opinion regarding Plaintiff's physical limitations and other medical evidence supporting Dr. Amundson's opinion, I conclude that the case must be remanded.  Further, I conclude that those errors, in light of the particular history and record in Plaintiff's case, result in remand for an award of benefits.

1.     Consideration of Mental Health Treatment Evidence

Plaintiff complains that the ALJ discounted the opinions of consultative examiners Drs. Volpe and Roy in favor of non-examining records reviewer Dr. Urbanowicz, disregarding the governing regulations.  Doc. 6 at 4-9; Doc. 10 at 1-2.  Defendant responds that substantial evidence supports the ALJ's evaluations of Drs. Volpe, Roy, and Urbanowicz.  Doc. 9 at 6-12.

20

Generally, the regulations governing Plaintiff's claim dictate that an ALJ must give medical opinions the weight she deems appropriate based on factors such as whether the physician examined or treated the claimant, whether the opinion is supported by medical signs and laboratory findings, and whether the opinion is consistent with the record as a whole.  20 C.F.R. § 404.1527(c).[34]  "The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects."  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Stewart v. Sec'y HEW, 714 F.2d 287, 290 (3d Cir. 1983)).  When there is a conflict in the evidence, the ALJ may choose which evidence to credit and which evidence not to credit, so long as she does not "reject evidence for no reason or for the wrong reason."  Rutherford, 399 F.3d at 554; Plummer, 186 F.3d at 429; see also 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

Here, as previously discussed, consultative examiner Dr. Volpe found that Plaintiff had "moderate" limitation in the abilities to carry out simple instructions and make judgments on simple work-related decisions, and "marked" limitation in the abilities to carry out complex instructions and respond appropriately to usual work situations and changes in a routine work setting.  Tr. at 396-97.  Dr. Roy did not complete a Medical Source Statement, but indicated that Plaintiff had a GAF score of 43,

---

[34]Effective March 27, 2017, the Social Security Administration amended the regulations regarding the evaluation of medical evidence, eliminating the assignment of weight to any medical opinion.  See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).  Because Plaintiff filed her application on December 15, 2015, the opinion-weighing paradigm is applicable.

indicating serious symptoms.  Id. at 350; supra at 15 & n.26.  Dr. Urbanawicz opined that

Plaintiff was "not significantly limited" in the abilities to carry out short, simple

instructions, and make simple work-related decisions; and moderately limited in the

abilities to carry out detailed instructions and respond appropriately to changes in the

work setting.  Tr. at 82-84.[35]

     After reviewing the limitations Dr. Volpe found, the ALJ gave "some weight" to

the doctor's opinion expressed in the Medical Source Statement.

> I give some weight to Dr. Volpe's opinion.  While I concur
> with most of the doctor's assessed limitations, I find that her
> "marked" limitation with respect to the ability to respond
> appropriately to usual work situations and to changes in a
> routine work setting an [sic] overestimate of [Plaintiff's]
> capabilities.  The record shows that while [Plaintiff] suffers
> from significant symptomatology of anxiety, depression, and
> PTSD, she can maintain a routine and perform many
> activities of daily living within a schedule, albeit with
> assistance (see [tr. at 183-91, 192-200]; Hearing Recordings).
> Thus, I find that Dr. Volpe's opinion merits some weight.

Tr. at 664.[36]

     In considering Dr. Volpe's opinion, the ALJ gave no consideration to whether the

doctor's assessment was supported by her examination results or whether the doctor's

conclusions were consistent with other evidence in the record.  For example, the ALJ

---

[35]I have focused on the differences between the opinions of Drs. Volpe and
Urbanawicz.

[36]It appears that the ALJ misspoke in stating that Dr. Volpe's opinion was an
"overestimate" of Plaintiff's "capabilities."  In context, the ALJ is saying that Dr. Volpe
overestimated Plaintiff's limitations (or underestimated her capabilities) when she found
a "marked" limitation in the ability to respond appropriately to usual work situations and
changes in a routine work setting.

failed to consider that the limitations identified by Dr. Volpe are consistent with the doctor's examination, which revealed impaired concentration and memory skills evidenced by Plaintiff's difficulty doing serial 3s and remembering four digits.  Tr. at 393.  The stated limitations are also consistent with Dr. Volpe's assessment that Plaintiff would need assistance to manage her funds based, in part, on her "observed limited memory and concentration abilities."  Id. at 394.

These limitations are also somewhat consistent with Dr. Roy's evaluation which was conducted about five months prior to Plaintiff's disability onset date.  Specifically, Dr. Roy noted that Plaintiff was very anxious and uncomfortable during the evaluation which manifested with Plaintiff wringing her hands and moving the chair.  Tr. at 349.  In addition, the doctor noted that Plaintiff "looked depressed" and became tearful.  Id.  Although he noted no evidence of any serious memory problems, he did state that Plaintiff was very slow to start the serial 7s.  Id. at 350.  He also found Plaintiff had a GAF score of 43, indicating serious symptoms.  Id. at 350; supra at 15 & n.26.

The ALJ gave little weight to the GAF score, finding it "unsupported by the contemporaneous treatment notes, which . . . show improvement in [Plaintiff's] condition with consistent treatment," citing four exhibits in the administrative record:  (1) progress notes from Nueva Vida from November 2015 to January 2016, (2) progress notes from Nueva Vida from February 2016 to November 2016, (3) Dr. Volpe's consultative examination report, and (4) the treatment notes from Citywide Counseling.  Tr. at 664.  The ALJ relied on this same evidence in giving Dr. Urbanowicz's opinion "significant weight," reasoning that the cited records "show that although [Plaintiff] has significant

indicia of anxiety, depression, and PTSD, she has demonstrated symptom improvement with consistent treatment . . . ." Id. at 663.  The problem is that the ALJ mischaracterized some of the evidence upon which she relied to both reject the GAF and give "significant weight" to Dr. Urbanowicz's opinion.

The Citywide Counseling notes from July 19 to December 4, 2018, do evidence improvement in Plaintiff's ability to sleep and a reduction in nightmares and auditory hallucinations when she is taking prazosin. Tr. at 1375-80.  However, the treatment notes from Nueva Vida, also cited by the ALJ, do not evidence improvement with consistent treatment.  The progress notes from Nueva Vida from November 2015 to January 2016 consist of four therapy treatment notes, the first two of which were dedicated to intake questions regarding Plaintiff's symptoms and behaviors.  Id. at 372 (11/27/05), 371 (12/05/15).  In both, therapist Castro described Plaintiff as cooperative, non-suicidal, with neutral mood and affect.  Id.  In the notes from January 6 and 15, 2016, therapist Castro indicated that Plaintiff is cooperative, with no suicidal or homicidal thoughts, but Plaintiff complained of feeling very depressed and anxious.  Id. at 369, 370.  Therapist Castro focused on helping Plaintiff develop skills to control, reduce, and improve her feeling of depression and stabilize her anxiety levels.  Id.

The progress notes then continue with weekly or biweekly sessions with therapist Castro until August of 2016. Tr. at 520-534.  During this time, Plaintiff was prescribed Prozac, hydroxyzine (Vistaril), and melatonin, id. at 509, and her dosage of Prozac was increased in June 2016.  Id.  Throughout this period, therapist Castro described Plaintiff as cooperative, non-suicidal, and non-violent.  See, e.g., id. at 534 (2/2/16), 528

(4/15/16), 525 (5/13/16), 523 (6/23/16).  Mr. Castro's focus remained to help to reduce Plaintiff's depressed mood and stabilize her anxiety levels.  Id.  Although there were two sessions wherein Plaintiff stated that she felt "more calm," id. at 523 (6/23/16), 525 (5/13/15), she remained anxious and depressed and these "calm" instances were short-lived.  Id. at 522 (7/8/16 – inability to control preoccupation with worry leading to heart palpitations and shortness of breath), 524 (5/31/16 – complains that anxiety and depression are uncontrolled).

There is a three-month gap in the treatment notes from August 4 until November 30, 2016.  See tr. at 519-20.  However, when Plaintiff resumed treatment, she had the same complaints of irrational worry with symptoms of heart palpitations and shortness of breath, and therapist Castro noted Plaintiff's depressed and anxious mood and affect with no suicidal or homicidal ideation and described her as cooperative.  Id. at 519.[37]  Thus, contrary to the ALJ's statement that these records "show improvement in [Plaintiff's] condition with consistent treatment," id. at 664, the Nueva Vida treatment notes indicate long-term anxiety and depression unabated with treatment, with symptoms of heart palpitations and shortness of breath in the later months of her treatment.

For these reasons, I find that the ALJ failed to properly consider the opinion evidence relating to Plaintiff's mental health impairments.  Additionally, I note that in its

---

[37]I note that Mr. Castro has stated that Plaintiff "is able to control, reduce and improve my feeling depressed and improve and stabilize my anxiety levels."  Tr. at 523, 525, 527, 528, 529, 530, 531, 532, 533, 534.  However, this statement appears in the "Plan for next session" section of the notes.  Id.  It is clear from the treatment notes that Plaintiff has never succeeded with this plan.

September 22, 2021 Order remanding the case to the ALJ, the Appeals Council specifically found that, despite giving Dr. Volpe's opinion "some weight," the RFC fashioned by the ALJ failed to accomodate Dr. Volpe's findings that Plaintiff was moderately limited in carrying out simple instructions and making simple decisions and markedly limited in responding to usual work situations or changes in a routine work setting.  Tr. at 788.  Although the ALJ has now addressed Dr. Volpe's opinion, the ALJ's consideration of that opinion is inadequate for the reasons stated -- it failed to acknowledge that the marked limitations noted by the doctor were supported by her concomitant examination notes and consistent with aspects of the evaluation performed by Dr. Roy five months prior to Plaintiff's disability onset date and the GAF score he assigned, which the ALJ rejected, in part, based on a mischaracterization of the evidence.  Similarly the ALJ gave "significant weight" to Dr. Urbanowicz's opinion based on the same mischaracterization of the evidence.[38]  Thus, I conclude that the ALJ's consideration of the opinions of Drs. Volpe, Roy, and Urbanowicz is not supported by substantial evidence.

---

[38]In addition, despite giving significant weight to Dr. Urbanowicz's opinion, the ALJ failed to address Dr. Urbanowicz's finding that Plaintiff was moderately limited in the abilities to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and complete a normal workday and workweek without interruptions from psychologically based symptoms.  See tr. at 83.  It is unclear if the ALJ rejected this finding or overlooked it, requiring remand.  See Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) ("In the absence of [any indication of the evidence rejected and reason for rejection], the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.") (quoting Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)).

2.    Inclusion of Limitations in the RFC Assessment

Plaintiff also claims that the ALJ failed to include all of Plaintiff's limitations in the RFC assessment and failed to explain her reasons for not including them.  Doc. 6 at 9-14; Doc. 10 at 2-4.  Defendant responds that the RFC assessment is supported by substantial evidence.  Doc. 9 at 12-16.  Because I have already found that the ALJ erred in considering the mental health treatment opinion evidence, I will focus on the ALJ's consideration of Plaintiff's physical limitations.

As noted, supra at 14, consultative examiner Dr. Amundson found that Plaintiff could occasionally lift and carry 21-50 pounds, frequently lift and carry 11-20 pounds, and continuously lift and carry up to 10 pounds.  Tr. at 379.  In addition, the doctor found that Plaintiff could sit for 4 hours in 2-hour increments and stand and walk for 2 hours each in 30-minute increments in an 8-hour day.  Id. at 380.

The ALJ gave Dr. Amundson's opinion "some weight."  Tr. at 663.

> While I concur with some portions of Dr. Amundson's opinion, particularly the manipulative limitations as well as exposure to hazards, and the fact that [Plaintiff] does not require an ambulatory assistive device, I find many of the doctor's other limitations an overestimate of [Plaintiff's] capabilities given the entire record.  For instance the doctor's opinion that [Plaintiff] could lift up to 50 pounds occasionally is inconsistent with the clinical findings of weakness of the right extremity . . .  (see [tr. at 330-35, 375-90, 402-65, 1132-86, 1367-71, 1384-86, 1760-1834]).  With respect to the doctor's limitations against exposure to wetness, humidity, and pulmonary irritants, there is no evidence in the record to support the imposition of such limitations.  For these reasons, I find the doctor's opinion entitled to only some weight.

Id. at 663.

Although I agree that Dr. Amundson's lifting limits were unsupported by the record, what is glaringly missing from the ALJ's analysis is any discussion of Dr. Amundson's limitations regarding Plaintiff's abilities to sit, stand, and walk. Rather, the ALJ included no specific limitations on Plaintiff's abilities to sit, stand, and walk. Indeed, the ALJ omitted any such limitation despite giving "significant weight" to Dr. Bermudez opinion, in which the doctor found that Plaintiff could sit and stand/walk for 6 hours each in an 8-hour workday. Tr. at 81, 662.

Dr. Bermudez's limitations actually overstate Plaintiff's abilities to sit, stand, and walk. Dr. Bermudez conducted her record review in February 2016, prior to the records most relevant to Plaintiff's abilities to sit, stand, and walk. For example, even when the focus of Plaintiff's treatment was for neck pain and weakness and limited range of motion of her right arm and hand, see tr. at 493 (4/20/16 – shoulder pain), 1370 (5/11/16 – limited range of motion of the neck), 1368-69 (6/1/16 - nerve conduction study revealed right chronic cervical radiculopathy), review of the record also reveals Plaintiff had difficulty with prolonged sitting, standing, and walking. See id. at 402, 404-05 (5/11/16 – physical therapy treatment note indicating Plaintiff's tolerance for sitting was 10 minutes and standing was 15 minutes and setting a goal of 30 minutes each), 464-65 (9/8/16 – after 18 physical therapy sessions Plaintiff able to sit for 10-20 minutes and stand for 20 minutes, goal remained of 30 minutes each).

On August 8, 2018, Dr. Gadea noted tenderness throughout Plaintiff's spine, diagnosed Plaintiff with dorsalgia, ordered an x-ray of Plaintiff's lumbar spine, and referred her for additional physical therapy. Tr. at 1334-38. Physical therapy notes from

November 2018, after 14 therapy sessions, indicate that Plaintiff could sit for 20 minutes and stand for 30 minutes with frequent positional changes.  Id. at 1184, 1158.  On November 28, 2018, therapist McShane noted that Plaintiff was able to tolerate 31 minutes on the treadmill, but continued "to demonstrate deficits in hip extensor strength as well as anterior hip decreased flexibility."  Id. at 1176.[39]

Despite the ALJ's acknowledgement that "later-acquired treatment records require the imposition of" limitations in addition to those found by Dr. Bermudez," tr. at 662, the ALJ failed to address the limitations in Plaintiff's abilities to sit, stand, and walk found by Dr. Amundson and consistently noted in the physical therapy treatment notes.[40]  It is unclear if the ALJ rejected this evidence, and, if so, on what basis, or if the ALJ overlooked this evidence in finding that Plaintiff could perform light work, which "requires a good deal of walking or standing, or . . .  involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).  As such, the case must be remanded.  See Burnett, 220 F.3d at 121.[41]

---

[39]Physical therapy notes post-dating the expiration of Plaintiff's insured status also evidence limitations in prolonged walking and standing.  See tr. at 1136 (3/11/20 – increased tolerance to 30 minutes on the treadmill).

[40]The VE was not asked about the sitting/standing/walking requirements of the jobs he identified or if they allowed for frequent changes in position.  Tr. at 688-93.

[41]Although "[s]urveying the medical evidence to craft an RFC is part of the ALJ's duties," Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006), the ALJ may not ignore probative evidence.  See Burnett, 220 F.3d at 121 (ALJ must "consider and explain his reasons for discounting all of the pertinent evidence before him in making his [RFC] determination").

      3.    <u>Remedy</u>

After a prior court remand based on the Commissioner's motion, a subsequent remand by the Appeals Council, three administrative hearings and ALJ decisions, a delay of over eight years, and the expiration of Plaintiff's insured status nearly six years ago, Plaintiff asks the court to remand the case for an award of benefits.  Doc. 6 at 14-17. Defendant argues that should the court find that the ALJ's decision is not supported by substantial evidence, the proper remedy is remand for further consideration of the treatment record, rather than an award of benefits.  Doc. 9 at 17.

The governing statute provides that the court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g) (sentence four).  Thus, the court has discretion to award benefits.

An "award [of] benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits."  <u>Podedworny v. Harris</u>, 745 F.2d 210, 221-22 (3d Cir. 1984).  "The Court of Appeals has held that where there has been inordinate delay, coupled with an existing record that contains substantial evidence supporting a finding of disability, a reversal with the direction to award benefits is appropriate, rather than a remand for further proceedings."  <u>Cordero v. Kijakazi</u>, 597 F. Supp.3d 776, 821 (E.D. Pa. 2022) (citing <u>Morales v. Apfel</u>, 225 F.3d 310, 320 (3d Cir. 2000)).  In <u>Morales</u>, the Third Circuit found that an award of benefits was appropriate

because "[t]he disability determination has already taken ten years and the record is

unlikely to change."  225 F.3d at 320.  Similarly, in determining whether to remand a

case for further consideration or for the award of benefits, the Honorable Martin Carlson,

my colleague in the Middle District, summarized the factors relevant to the court's

consideration.

> [A]ny decision to award benefits in lieu of ordering a remand
> for further agency consideration entails the weighing of two
> factors:  First, whether there has been an excessive delay in
> the litigation of the claim which is not attributable to the
> claimant; and second, whether the administrative record of
> the case has been fully developed and substantial evidence on
> the record as a whole indicates that the claimant is disabled
> and entitled to benefits.

Diaz v. Berryhill, 388 F. Supp.3d 382, 391 (M.D. Pa. 2019).

Weighing both factors in light of the record here, I conclude that an award of

benefits is appropriate.  As previously noted, Plaintiff originally applied for benefits over

eight years ago and her insured status for purposes of DIB expired over five years ago.

The delay is not attributable to Plaintiff.  When the case was first considered by an ALJ

on June 4, 2018, the ALJ to whom the case was then assigned found that Plaintiff had no

severe physical impairment and included no physical limitations in the RFC assessment.

Tr. at 25, 27-28.  Defendant asked this court to remand the case for "further consideration

of Plaintiff's claim."  Civil Action 19-657, Doc. 20 ¶ 2.  On remand, a different ALJ

found Plaintiff's severe impairments included cervical radiculopathy, right shoulder

bursitis, and carpal tunnel syndrome of the right hand.  Tr. at 769.  The ALJ did include

some physical limitations in the RFC, id. at 771, but the Appeals Council found that the

ALJ failed to, among other things, properly consider or include limitations found by Drs. Volpe and Urbanowicz.  Id. at 788.  As previously discussed, the decision currently under review suffers from the same flaw.  Thus, a decision in the case has involved significant delay which is not attributable to Plaintiff.

The more difficult question is whether the record is sufficient to support a finding of disability.  With respect to Plaintiff's physical impairments, Dr. Amundson found that Plaintiff could sit for 4 hours in 2-hour increments, and stand and walk for 2 hours each in 30-minute increments.  Tr. at 380.  As previously discussed, the physical therapy treatment notes consistently evidence limitations in Plaintiff's tolerances for prolonged sitting, standing, and walking, but the ALJ did not include any limitation in sitting, standing, or walking in the RFC assessment and did not explain the failure to include any such limitations.  See supra at 28-30.  The VE was not asked whether such additional limitations or a sit/stand option would affect the occupational base.  If this were the only flaw in the ALJ's decision, I would be inclined to remand for reconsideration with direction that additional vocational testimony be obtained to clarify the vocational base considering limitations on prolonged sitting, standing, and walking.

However, consideration of the previously-discussed mental health treatment evidence and related opinions establishes Plaintiff's disability in light of the VE testimony.  First, with respect to Dr. Urbanowicz's opinion, to which the ALJ gave "significant weight," the doctor found that Plaintiff was moderately limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual, and the ability to complete a normal workday and workweek without interruptions from

psychologically based symptoms.  Tr. at 83.  The ALJ did not address this aspect of the

doctor's opinion.  See supra n.38.  However, when asked if additional breaks in excess of

the normal lunch and 15-minute breaks during the day would be tolerated by employers,

the VE indicated that there would be "no competitive employment."  Id. at 692.

Similarly, the VE testified that the inability to be punctual resulting in tardiness twice a

month would be "borderline impairment to work."  Id.  Thus, based on Dr. Urbanowicz's

opinion, Plaintiff's mental health impairments would preclude employment.

Second, with respect to Dr. Volpe's assessment, as previously discussed, the ALJ

failed to consider the opinion's supportability based on the doctor's examination and

consistency with other evidence in the record.  See supra at 23-24.  Specifically, Dr.

Volpe opined that Plaintiff had moderate limitation in the abilities to carry out simple

instructions and make judgments on simple work-related decisions and marked limitation

in the ability to respond appropriately to usual work situations and to changes in a routine

work setting.  Tr. at 397.  When asking the VE about the marked limitation in the ability

to respond to usual work situations or changes in a routine work setting, Plaintiff's

counsel framed the question such that the individual would be likely to become off task

25% of the time.  Id. at 691-92.  The VE responded that no employer would tolerate such

limitation.  Id. at 692.  Therefore, based on Dr. Volpe's opinion, Plaintiff's mental health

impairments would preclude employment.  Thus, both of the mental health physicians

who offered opinions during the relevant period included limitations that the VE testified

would be work-preclusive.  Therefore, I conclude that an award of benefits is appropriate.

IV.    **CONCLUSION**

The ALJ's decision is not supported by substantial evidence.  The ALJ failed to properly consider the mental health treatment evidence and mischaracterized evidence in her analysis.  In addition, the ALJ failed to include limitations in Plaintiff's abilities to sit, stand, and walk found by the consultative examiner and supported by the record.  Because the ALJ did not include these limitations or explain her failure to include them in the RFC assessment, it is unclear whether she rejected them or overlooked the evidence.

After considering the record as a whole and the multiple remands of the case, delaying adjudication of Plaintiff's claim for over eight years, I remand the case for the award of benefits.

An appropriate Order and Judgment Order follow.